# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Logans' Reserve Homeowners' Association | : | |
| | : | |
| v. | : | |
| | : | |
| Jeffrey McCabe and Jennifer McCabe, Appellants | : | No. 820 C.D. 2016 |
| | : | |
| Logans' Reserve Homeowners' Association | : | |
| | : | |
| v. | : | |
| | : | |
| Jeffrey McCabe and Jennifer McCabe, Appellants | : | No. 821 C.D. 2016 |
| | : | Argued: December 12, 2016 |

BEFORE:  HONORABLE RENÉE COHN JUBELIRER, Judge
HONORABLE ANNE E. COVEY, Judge
HONORABLE JAMES GARDNER COLINS,  Senior Judge

OPINION BY
JUDGE COVEY                                             FILED: January 4, 2017

Jeffrey McCabe (Mr. McCabe) and Jennifer McCabe (collectively, the McCabes) appeal from the York County Common Pleas Court's (trial court) April 22, 2014, February 17, 2016 and April 15, 2016 orders granting Logans' Reserve Homeowners' Association's (Association) partial summary judgment motion, denying the McCabes' motion for continuance, and denying the McCabes' post-trial relief motion. There are three issues[1] for this Court's review: (1) whether the trial court erred in granting the Association's partial summary judgment motion; (2)

---

[1] In their brief, the McCabes set forth four issues; however, we have combined the first two issues.

whether the trial court erred in denying the McCabes' continuance motion; and, (3) whether the trial court erred in denying the McCabes' post-trial relief motion (Post-Trial Motion). After review, we affirm.

On August 28, 2006, the McCabes purchased real property at 1118 Silver Maple Circle in Seven Valleys, Pennsylvania (the Property). The Property is located within Logan's Reserve (the Development), a community owned and maintained by the Association, and is subject to the Uniform Planned Community Act (Act)[2] and the Association's Declaration, By-Laws and amendments thereto (Declaration). The Declaration requires property owners, including the McCabes, to pay common expense[3] assessments to the Association. *See* Declaration § 9.2.1.

After the McCabes purchased the Property, the Association assessed them monthly dues, which they paid. However, in June 2009, the McCabes ceased paying the dues. On April 8, 2010, the Association instituted an action against the McCabes in Magisterial District Court. On June 23, 2010, the Magisterial District Judge entered judgment in the McCabes' favor. On July 1, 2010, the Association filed a notice of appeal from the June 23, 2010 judgment. On August 10, 2010, the Association filed a complaint in the trial court against the McCabes seeking recovery of their unpaid assessments, as well as late fees and attorneys' fees. On October 22, 2010, the McCabes filed an answer with new matter and counterclaim explaining that they stopped paying the assessed dues because the Association had "failed, and continues to fail to maintain the common area behind [the McCabes'] back lawn (. . .

---

[2] 68 Pa.C.S. §§ 5101-5414.

[3] The Declaration defines "[c]ommon [e]xpenses" as "expenditures made by or financial liabilities of the Association, together with any allocations to reserves." Declaration § 1.5.2(h), Reproduced Record (R.R.) at 67a. Section 9.1.1 of the Declaration provides that common expenses include "[e]xpenses of administration, maintenance, and repair or replacement of the [c]ommon [e]lements . . . ." Declaration § 9.1.1, R.R. at 82a.

Common Area[]).["4]  Reproduced Record (R.R.) at 35a.  In their new matter, the McCabes alleged that the Association had not maintained the Common Area since the McCabes moved into the Property in August 2006, and that the Common Area was overgrown with weeds and shrubs, thereby causing their lawn and home to be infested with ticks and other insects, for which they incurred treatment expenses.  In their counterclaim, the McCabes claimed that the Association's failure to maintain the Common Area constituted a breach of the Declaration and resulted in the aforementioned expenses.  Accordingly, the McCabes sought reimbursement of the expenses, plus reimbursement of dues they paid between August 2006 and June 2009.  The Association filed its answer to the new matter and counterclaim on October 22, 2010.

On November 12, 2013, the Association filed its partial summary judgment motion alleging that there were no genuine issues of material fact, that the McCabes had failed to pay their assessed dues and that, as a matter of law, the McCabes were prohibited from withholding payment of common expense assessments as self-help to address their dissatisfaction with the Association's alleged failure to maintain the Common Area.  The Association also sought attorneys' fees and costs.  After oral argument, on April 22, 2014, the trial court granted the Association's partial summary judgment motion, entered judgment in the Association's favor, and awarded attorneys' fees and costs.  The case continued on the McCabes' counterclaim.

The McCabes requested that their counterclaim proceed to arbitration.  At arbitration, the McCabes were awarded $2,711.06 (Arbitrators' Award).  The McCabes appealed from the Arbitrators' Award to the trial court on the basis that the arbitrators did not award attorneys' fees.

_____

[4] Due to a caption error, on December 21, 2010, the McCabes filed an amended answer, new matter and counterclaim correcting the caption.

3

On August 31, 2015, the parties' counsel signed a Certificate of Trial Readiness (Certificate) declaring to the trial court that the matter was ready for trial. The Certificate also certified "that all witnesses will be on call and available during the entire scheduled trial term." R.R. at 579a. A non-jury trial was scheduled for February 17, 2016 before Judge Stephen P. Linebaugh (Judge Linebaugh). Judge Linebaugh held a pretrial conference on October 1, 2015. Prior to trial, Judge Linebaugh conducted a site visit.

On February 9, 2016, the Association filed its pre-trial brief wherein it argued the business judgment rule as a defense to the McCabes' action. On the evening of February 12, 2016, the McCabes' witness, former Association President Howard Asche (Asche), informed the McCabes that he could not attend trial due to a scheduling conflict. On February 15, 2016, the McCabes filed a First Motion for a Trial Continuance (Continuance Motion) by first class mail with a certificate of service dated February 15, 2016.[5] Therein, the McCabes explained that Asche was unavailable and that his testimony was directly relevant to the Association's business judgment rule defense.[6] The trial court's Prothonotary's office time-stamped the

---

[5] The McCabes state in their brief to this Court that they "timely filed their [Continuance Motion] on the next day the York [County] Prothonotary's office was open, which was February 16, 2016 due to the weekend, a holiday and inclement weather. This was only one (1) day prior to the date of trial itself, however." McCabes' Br. at 12. There is no explanation for the discrepancy between the February 15, 2016 mailing date, the February 17, 2016 time-stamped date, and the McCabes' representation that the Continuance Motion was filed on February 16, 2016.

[6] Our Supreme Court has explained:

> The business judgment rule insulates an officer or director of a corporation from liability for a business decision made in good faith if he is not interested in the subject of the business judgment, is informed with respect to the subject of the business judgment to the extent he reasonably believes to be appropriate under the circumstances, and rationally believes that the business judgment is in the best interests of the corporation.

*Cuker v. Mikalauskas*, 692 A.2d 1042, 1045 (Pa. 1997). "[I]f a court makes a preliminary determination that a business decision was made under proper circumstances, however that concept

4

Continuance Motion on February 17, 2016.  Notwithstanding, the trial was held as scheduled on February 17, 2016.  On the last day of trial, the McCabes renewed their Continuance Motion, and requested the trial court to keep the record open so they could obtain Asche's testimony before the trial court rendered a decision.  The trial court refused the McCabes' request.  In a February 17, 2016 written order, the trial court denied the Continuance Motion, explaining:

is currently defined, then the business judgment rule prohibits the court from going further and examining the merits of the underlying business decision.  *Id.* at 1047.

Although the parties herein argue the business judgment rule, our Superior Court has found that Section 5303 of the Act

> govern[s] the standard with which we review decisions made by the [association's executive b]oard.  This section is stated, in pertinent part, as follows:
>
> **§ 5303.  Executive board members and officers**
>
> (a) POWERS AND FIDUCIARY STATUS.--Except as provided in the declaration, in the bylaws, in subsection (b) or in other provisions of this subpart, the executive board may act in all instances on behalf of the association.  In the performance of their duties, the officers and members of the executive board shall stand in a fiduciary relation to the association and shall perform their duties, including duties as members of any committee of the board upon which they may serve, in good faith; in a manner they reasonably believe to be in the best interests of the association; and with care, including reasonable inquiry, skill and diligence as a person of ordinary prudence would use under similar circumstances. [ . . . ].
>
> 68 Pa.C.S.[] § 5303.  Therefore, [a court] review[s] the actions of the [association's executive b]oard to determine if they acted 'in good faith; in a manner they reasonably believe to be in the best interests of the association; and with care, including reasonable inquiry, skill and diligence as a person of ordinary prudence would use under similar circumstances.'  *See* 68 Pa.C.S.[] § 5303.

*Burgoyne v. Pinecrest Cmty. Ass'n*, 924 A.2d 675, 683 (Pa. Super. 2007).

5

The [trial court] conducted a pretrial conference in this matter on October 1, 2015. At that time, Counsel selected the date for the trial and had selected the date for today's date and time.

The allegation in the motion is that there's a witness who is unavailable because he has meetings in New Jersey relative to this appointment, and that is not a sufficient justification to continue the trial when a witness could have been made available by the moving party.

R.R. at 345a-346a.

On March 23, 2016, the trial court found in favor of the Association and against the McCabes on the McCabes' counterclaim (March 23, 2016 Order). The McCabes filed the Post-Trial Motion seeking reconsideration, a new trial or other equitable relief. On April 15, 2016, the trial court denied the McCabe's Post-Trial Motion. The McCabes appealed to the Pennsylvania Superior Court. The Superior Court, *sua sponte*, transferred the matter to this Court.[7]

The McCabes first argue that the trial court erred when it granted the Association's partial summary judgment motion. The McCabes contend that a genuine issue of material fact[8] remains regarding whether the Association breached the Declaration, thereby justifying the McCabes' failure to pay their assessments.

Section 5314 of the Act provides:

**(a) General rule.--**Until the association makes a common expense assessment, the declarant shall pay all the expenses of the planned community. After any assessment has been made by the association, assessments shall be made at least annually, based on a budget adopted at least annually by the

---

[7] "Appellate review of a trial court's grant of summary judgment is limited to determining whether the trial court committed an error of law or abused its discretion. Moreover, summary judgment may be granted only in cases where it is clear and free from doubt that the moving party is entitled to judgment as a matter of law." *Bashioum v. Cnty. of Westmoreland*, 747 A.2d 441, 442 n.1 (Pa. Cmwlth. 2000) (citation omitted).

[8] "A material fact is one that directly affects the outcome of the case." *Kenney v. Jeanes Hosp.*, 769 A.2d 492, 495 (Pa. Super. 2001) (quoting *Kuney v. Benjamin Franklin Clinic*, 751 A.2d 662, 664 (Pa. Super. 2000)).

6

association. The budgets of the association shall segregate limited common expenses from general common expenses if and to the extent appropriate.

**(b) Allocation and interest.--**Except for assessments under subsection (c), all common expenses **shall be assessed against all the units** in accordance with the common expense liability allocated to each unit in the case of general common expenses and in accordance with subsection (c) in the case of special allocation of expenses. Any past[-]due assessment or installment thereof shall bear interest at the rate established by the association at not more than 15% per year.

**(c) Special allocations of expenses.--**Except as provided by the declaration:

(1) Any common expense associated with the maintenance, repair or replacement of a limited common element shall be assessed in equal shares against the units to which that limited common element was assigned at the time the expense was incurred.

(2) Any common expense benefiting fewer than all of the units shall be assessed exclusively against the units benefited.

(3) The costs of insurance shall be assessed in proportion to risk, and the costs of utilities that are separately metered to each unit shall be assessed in proportion to usage.

(4) If a common expense is caused by the negligence or misconduct of any unit owner, the association may assess that expense exclusively against his unit.

68 Pa.C.S. § 5314 (text emphasis added). Section 5315(a) of the Act states:

**The association has a lien on a unit for any assessment levied against that unit or fines imposed against its unit owner from the time the assessment or fine becomes due. The association's lien may be foreclosed in a like manner as a mortgage on real estate.** A judicial or other sale of the unit in execution of a common element lien or any other lien shall not affect the lien of a mortgage on the unit, except the mortgage for which the sale is being held, if the mortgage is prior to all other liens upon the same

property except those liens identified in [Section 8152(a) of the Judicial Code,] 42 Pa.C.S. § 8152(a) (relating to judicial sale as affecting lien of mortgage) and liens for planned community assessments created under this section. Unless the declaration otherwise provides, fees, charges, late charges, fines and interest charged under [S]ection 5302(a)(10), (11) and (12) [of the Act] (relating to power of unit owners' association) and reasonable costs and expenses of the association, including legal fees, incurred in connection with collection of any sums due to the association by the unit owner or enforcement of the provisions of the declaration, by[-]laws, rules or regulations against the unit owner are enforceable as assessments under this section. If an assessment is payable in installments and one or more installments are not paid when due, the entire outstanding balance of the assessment becomes effective as a lien from the due date of the delinquent installment.

68 Pa.C.S. § 5315(a) (emphasis added).

The Pennsylvania Superior Court in *Rivers Edge Condominium Association v. Rere, Inc.*, 568 A.2d 261 (Pa. Super. 1990), was the first appellate court to address the issue of whether a condominium unit owner can withhold assessment payments based on an association's failure to maintain the common areas. In *Rivers Edge,* a condominium owner refused to pay assessments to the association because the owner believed that the association had failed to maintain and repair the common elements. The owner also claimed that he suffered property damage caused by water leaks.[9] The Superior Court held that the owner's "action in withholding his condominium assessments, even assuming that he has suffered the property damage he alleges, is not justified by the language of the . . . [c]ondominium [b]y-laws, the statutes of this Commonwealth, or general public policy considerations." *Id*. at 263.

The *Rivers Edge* Court expounded:

The [c]ondominium [b]y–[l]aws explicitly require that a unit owner continue to pay the condominium assessment

---

[9] The governing statute in *Rivers Edge* was the Uniform Condominium Act, 68 Pa.C.S. §§ 3101-3414.

even if the owner is *not* receiving services owed to him, i.e., repairs to the common elements. When an individual purchases a condominium unit . . . , he necessarily accepts this provision allowing for no exemption from payment of the assessments. Such a provision benefits all of the unit owners because if all unit owners continue to pay the assessments, maintenance and repairs to the common elements will continue to be possible. **A condominium form of ownership in real estate succeeds, because unit owners agree to cooperate in the maintenance of common elements. When the [property owner] purchased his [condominium] units . . . , he chose to accept the benefits and obligations which accompany this form of real estate ownership.** Although no appellate court in Pennsylvania has addressed the issue of whether the owner of a condominium unit may withhold condominium assessments based upon the alleged failure of the condominium association to maintain common elements, this issue was addressed by the Court of Common Pleas of Philadelphia in *Society Hill Towers Owners' Association v. Matthew,* 32 Pa. D. & C.3d 244 (1982). There, a judgment by confession had been entered in favor of a condominium association against unit owners who had failed to pay assessments. The unit owners claimed that they failed to pay the assessments due to the failure of the [a]ssociation to provide required maintenance services. The trial court aptly responded to this contention:

> Regarding petitioners' contention that their obligation to pay was dependent upon the provision of services, nothing in their deed, the Condominium Declaration or Code of Regulations supports it. Under the Code of Regulations, unit owners are required to pay all assessments and have no right to withhold payment for alleged nonprovision of services. Petitioners should have directed their dispute over maintenance services to the condominium council rather than unilaterally withholding assessments.

*Id.* at 247-[]48.

We find it significant that nothing in [the Act] supports the type of self-help action undertaken by the [condominium

9

owner]. **Had the Legislature intended to allow owners of condominium units to withhold assessments where owners believe that their condominium association is not performing its obligations properly, we believe the Legislature would have explicitly so provided.**

*Rivers Edge*, 568 A.2d at 263 (bold emphasis added).[10] Accordingly:

[N]othing in the [Act] supports the type of self-help action undertaken by [the McCabes]. Had the Legislature intended to allow owners of [homes subject to homeowners' associations] to withhold assessments where owners believe that their . . . association is not performing its obligations properly, we believe the Legislature would have explicitly so provided.

*Id*. at 263.[11]

---

[10] In *Rivers Edge*, the by-laws explicitly required "that a unit owner continue to pay the condominium assessment even if the owner is not receiving services owed to him." *Id*. at 263. Although, there is no similar provision in the Association's Declaration, we do not find that factor dispositive, since the other considerations discussed in *Rivers Edge* also apply here.

[11] More recently, in *Fawn Ridge Estates Homeowners Association v. Carlson* (Pa. Cmwlth., No. 1462 C.D. 2010, filed July 25, 2011), an unreported opinion, this Court endorsed the Superior Court's position in *Rivers Edge* that withholding assessment payments based on an owner's alleged harm is impermissible and applied the same legal analysis to a homeowner's association. It stated:

**Although [a]ppellants' ancillary issues allege improprieties and/or illegalities of the assessments, such issues are not a defense for non-payment and cannot be used to delay payments that are due as a matter of law to the [a]ssociation.** *See generally Locust Lake Vill*[.] *Prop*[.] *Owners Ass*['*n*] *v. Wengerd,* 899 A.2d 1193, 1199 (Pa. Cmwlth. 2006) (rejecting the homeowners' argument that they are not liable for the association's charges); *Hess v. Barton Glen Club, Inc.,* 718 A.2d 908, 913 (Pa. Cmwlth. 1998) (concluding that all of the owners are responsible for a proportionate share of the costs of maintaining all of the association's common facilities); *Spinnler Point Colony Ass*['*n*]*, Inc. v. Nash,* 689 A.2d 1026, 1029 (Pa. Cmwlth. 1997) (holding that appellants, 'who have the right to travel the development roads and to access the waters of a lake, are obligated to pay a proportionate share for repair, upkeep and maintenance of the development's roads, facilities and amenities'); *Fogarty v. Hemlock Farms C*[*mty.*] *Ass*['*n*]*, Inc.,* 685 A.2d 241, 244 (Pa. Cmwlth. 1996) (holding that absent language in the deed covenant prohibiting an association from levying special assessments for capital

As a matter of law, the McCabes were required to pay the Association's assessments regardless of any alleged inadequacies in the Association's performance. Therefore, since any such breach of the Association's Declaration would not relieve the McCabes of their obligation to pay their assessments, the question of whether the Association breached them does not involve a material fact. Thus, the trial court properly granted the Association's partial summary judgment motion.[12]

improvements, the homeowners may be assessed their proportionate costs to construct the new improvements); *Meadow Run & Mountain Lake Park Ass*[*'n*] *v. Berkel,* 598 A.2d 1024, 1026 (Pa. Super. 1991) (noting that residential communities are 'analogous to mini-governments' that 'are dependent on the collection of assessments to maintain and provide essential and recreational facilities' and that, absent an express agreement prohibiting assessments, when an association of property owners in a private development is referred to in the chain of title and has the authority to regulate each property owner's use of common facilities, inherent in that authority is the association's ability to impose reasonable assessments to fund the maintenance of those facilities); *Wrenfield Homeowners Ass*[*'n*]*, Inc. v. DeYoung,* 600 A.2d 960, 964 (Pa. Super. 1991) (holding that the association's declaration clearly makes the defaulting homeowner liable for assessments plus the cost of collection for the amount in default to the association, including attorneys' fees); *Rivers Edge . . .* (holding that appellant's action in withholding his condominium assessments, even assuming that he has suffered the property damage he alleges, is not justified by the language of the By–Laws, the statutes of this Commonwealth, or general public policy considerations).

*Fawn Ridge Estates,* slip op. at 6-7 n.8 (emphasis added). Although this Court's unreported memorandum opinions may only be cited "for [their] persuasive value," we find *Fawn Ridge Estates* particularly instructive. Section 414(a) of the Commonwealth Court's Internal Operating Procedures, 210 Pa. Code § 69.414(a).

[12] The McCabes focus on the contractual nature of their obligation to pay assessments, and the Association's purported failure to meet its obligations thereunder. However, the McCabes' duty to pay assessments was triggered by their purchase of the Property. The Association's imposition of assessments and the McCabes' obligations were created by the Act, and thus do not arise by contract.

The McCabes also claim that despite the provision in Section 5315(a) of the Act stating that "[t]he [A]ssociation has a lien on a unit for any assessment levied against that unit or fines imposed against its unit owner from the time the assessment or fine becomes due[,]" an association's lien

The McCabes next argue that the trial court erred when it denied their Continuance Motion. Although the McCabes acknowledge that "[t]he decision to grant or deny a continuance is exclusively within the discretion of the trial court, and this Court will not disturb the trial court's determination in the absence of an apparent abuse of discretion[,]" they contend that the trial court abused its discretion because the trial court's judgment was manifestly unreasonable. McCabes' Br. at 23 (quoting *Gillespie v. Dep't of Transp., Bureau of Driver Licensing*, 886 A.2d 317 (Pa. Cmwlth 2005)). Specifically, the McCabes assert that the trial court acted unreasonably by denying their Continuance Motion where their unavailable witness was the sole individual able to rebuke the Association's business judgment rule defense.

The Association responds:

> If the McCabes thought that [] Asche was a crucial trial witness, which [the Association] disputes, all they had to do was issue a trial subpoena to him or schedule his deposition for use at trial. Perhaps [] Asche's meeting in New Jersey was not scheduled until the evening of February 12th, although that would seem to be questionable, and again, nothing was presented at trial to really explain why [] Asche allegedly did not become unavailable until the evening of February 12, 2016.

Association's Br. at 27-28.

> Although it is the policy of the law that parties to an action have the benefit of the personal attendance of material witnesses whenever reasonably practicable, it lies within the

---

**must** be foreclosed in a like manner to a mortgage foreclosure. 68 Pa.C.S. § 5315(a). They further contend that "[m]ortgage foreclosures still require proof of a contract, the mortgage, and no case law or statutory authority exempts them from the same rule of prior material breach that applies to all contracts." McCabes' Br. at 22.

Conversely, Section 5315 of the Act states that "[t]he association's lien **may** be foreclosed in a like manner as a mortgage on real estate." 68 Pa.C.S. § 5315(a) (emphasis added). Such language is not mandatory. Further, since the imposition of assessments arises from the Act, proof of contract is not required. Property ownership subject to the Association is all that is required. Finally, as previously discussed, the Association's alleged prior material breach did not relieve the McCabes of their assessment payment obligations.

12

discretion of the trial court to determine, in the light of all the circumstances of each case, whether or not a case before it should be continued on the ground of absence of material witnesses. [*See Carey v. Phila. Transp. Co.*, 237 A.2d 233 (Pa. 1968); *Barner v. Juniata Cnty. Tax Claim Bureau*, 522 A.2d 169 (Pa. Cmwlth. 1987); *Williamson v. Phila. Transp. Co.*, 368 A.2d 1292 (Pa. Super. 1976).] In granting a continuance based on the absence of a witness, **the trial court may require a party to show he or she exercised due diligence in attempting to secure a witness for trial.** [*See In re Kuzmiak*, 845 A.2d 961 (Pa. Cmwlth. 2004); *City of New Castle v. Uzamere*, 829 A.2d 763 (Pa. Cmwlth. 2003).] **A continuance because of the absence of a witness will only be granted where it is shown** that the expected testimony is competent and material and not merely cumulative or impeaching, that the testimony is credible and would probably affect the outcome of the trial, and **that due diligence has been exercised to secure the witness for trial, including efforts to subpoena the absent witness and to take his or her deposition.** [*See Carey*; *Nikole, Inc. v. Klinger*, 603 A.2d 587 (Pa. Super. 1992); *Barner*; *Kaplan v. Redev. Auth. of City of Phila.*, 403 A.2d 201 (Pa. Cmwlth. 1979); *Williamson*.]

7 STANDARD PA. PRACTICE 2d, "Continuances and Mistrials," § 38:17 (footnotes omitted; emphasis added).

Accordingly, contrary to the McCabes' assertion, whether the witness was important or even necessary to the McCabes' case is **not** the sole determining factor in evaluating the reasonableness of the trial court's disposition but, as argued by the Association, the McCabes' conduct must also be considered. Given the late notice, and the fact that the McCabes failed to subpoena Asche or take his deposition for use at trial, the McCabes did not exercise due diligence to secure him for trial, thus the trial court's denial of the continuance request was not an abuse of discretion, even if Asche was crucial to their case. Accordingly, we conclude the McCabes' argument lacks merit.

Finally, the McCabes contend that the trial court erred when it denied their Post-Trial Motion because "[t]he [t]rial [c]ourt's conclusion . . . is simply not

13

supported by the record and is therefore an abuse of discretion to such an extent that it shocks the conscience." McCabes' Br. at 28. Specifically, the McCabes argue that the trial court ignored the Association's admission that it had failed to maintain the Common Area.

> This Court has explained:
>
> When reviewing a trial court's denial of a motion for post-trial relief, our scope of review is limited to a determination of whether the trial court abused its discretion or committed an error of law. Additionally, we must review the record in a light most favorable to the verdict winner, who is afforded the benefit of all reasonable inferences that arise from the evidence.

*Ellis v. City of Pittsburgh*, 703 A.2d 593, 593 (Pa. Cmwlth. 1997) (citation omitted).

The McCabes testified with respect to the condition of the Property and the Common Area. Mr. McCabe explained that there is a hill at the rear of their yard. The rear property line extends approximately 20 feet down the hill. The hill continues for approximately another 20 feet. According to Mr. McCabe, there is a field with a retaining pond approximately 100 feet away, at the bottom of the hill. Mr. McCabe claimed that the retaining pond and the land adjacent to the rear Property line became excessively overgrown with weeds and that, although he informed the Association about his concerns, the Association failed to address them. He stated that such overgrowth resulted in insects, rodents and snakes. Because the Association failed to take action, he hired an individual to remove the weeds and brush. He also testified that he purchased equipment to remove the overgrowth. Mr. McCabe acknowledged that, for the past two years, the Association has been mowing the 20-foot portion of Common Area on the hill. Jennifer McCabe confirmed that she and Mr. McCabe had contacted the Association numerous times about the Common Area's condition, that ticks had infested the Property, and that she and Mr. McCabe had paid for the Common Area's care.

14

The Association's secretary Louis Dimitri (Dimitri) testified:

[W]e typically develop a plan usually around the beginning of the year on what we plan to mow. We develop our budget, which we present to the homeowners, and that's the plan we implement throughout the year. And as areas get turned over to [the Association by the developer], we add to it.

R.R. at 413a. Dimitri described:

Q. On this mowing plan, does it show that that area would be mowed?

A. No.

Q. Why was that?

A. Looking at the dates of this mowing plan, the Association -- the [Association's] executive board [(Board)] was transitioned from developer-controlled to homeowner-controlled in March of 2012. What that means is that the developer held two positions -- two voting positions -- on the . . . Board and there was a Homeowner representative. In March of 2012. [sic] There were various – there's a benchmark in the [D]eclaration[] when the developer was required to transfer over control of the . . . Board and the [A]ssociation from their control to the homeowners. So looking at the dates here that this was developed for the 2011 and 2012 time, that this was developed when the developer Manekin was under control or in control of the Board.

R.R. at 419a-420a. Dimitri further represented:

A. . . . . Beginning in 2012, once the transition was completed, the mowing plan started growing to fit the needs of the residents. And in talking with the [Association's] President -- the current President Kim Erskine, who is on the [B]oard at the time -- that area behind the McCabe[s' Property] was addressed to a certain length, which I believe was testified about 20 feet or so.

Q. Down to the bottom of that bank . . . ?

15

A. Yes. It's about 20 feet, give or take, I believe. Yes.

Q. And beyond that where it levels out, that's the retention pond area that's under the control of the developers until it's turned over?

A. Correct. I believe -- and even to this day, I believe that they currently come through maybe once a year, sometimes twice, to kind of clear out some of the brush, but that is -- we have usually no knowledge of when they're going to do it or how frequently. We usually find out about it from other residents saying somebody was out here, and we know it wasn't us.

Q. As far as you know, was that maintenance for the County regulations or whatever the regulations are for storm water management areas or retention ponds, or don't you know?

A. I don't know. I do know that the enforcement from what I read -- I believe enforcement either begins this year or next year. So I don't know the purpose of clearing them out, other than aesthetics maybe.

R.R. at 421a-422a. Dimitri claimed that not all of the Development's common areas are mowed.

In addition, Dimitri explained that part of the area behind the Property is used for storm water management:

Q. Now, the area behind the [McCabes'] house down at the bottom of the bank, what's that area in there?

A. That was part of the storm water or the storm water management – it's still the temporary storm water management.

Q. Technically, who's in charge of that area at this time?

A. That is the developer. They are -- the parent company is Manekin, but they have set up [a limited liability company], which is Logan's Reserve Development, LLC. I believe that's part of the way they do business for various reasons.

16

Q. Technically, is that under the control of the []
Association?

A. No, not at this time.

Q. At some point, will it be?

A. Yes. In talking with the point of contact for the
developer at Manekin, that will occur once all the
construction is completed. They will then turn into what is
known as a permanent storm water management, and then it
will be the [] Association's responsibility to maintain it.

Q. Now, what maintenance is done by the [] Association of
an area such as that?

A. In terms of the permanent pond, which are [sic] located .
. . in the Grand Lake Pond, which is at the bottom of the
Grand Lake Road . . . . Those at this time -- we will be
maintaining them this year for the first time since they've
been handed over. We've contracted a company called ESI
to do the maintenance, and they [sic] will be maintaining it
basically to the environmental and legal requirements that
we are required to maintain the pond. Because otherwise, if
we fail to do that, we face substantial fines.

Q. And what exactly does that consist of? Making sure the
grates are clear and things like that?

A. Mowing weeds, clearing out brush around that.
Basically making it so the ponds can function as intended.

Q. **But at this point, that is the responsibility of whom?**

A. On these two ponds?

Q. **The one behind the McCabe house.**

A. **That's currently the responsibility of the developer.**

R.R. at 417a-419a (emphasis added). On cross-examination, Dimitri was asked:
"Does [the Association] currently define maintenance or maintained to include
homeowners being subject to ticks, bugs and snakes?" R.R. at 423a. Dimitri
answered "[n]o." *Id.*

17

Finally, Dimitri responded to the trial court's questions as follows:

THE COURT: I just want to know whether or not the Board -- since you've been on the Board, as far as their [sic] discussions and decisions, decide what parts they're [sic] going to maintain and how they're going to be maintained.

THE WITNESS: Yes. Certain areas – we get the mowing plan. I think this one was revised at the end of the season. The current one we have, we revised at the end of the season because substantial property was turned over to us. So we added to the plan. There's still new areas that are under construction. We don't know when we're going to be responsible for that, and as that gets turned over, we either find out from the developer or from residents that complain. And we follow up on it, and we add to it throughout the year. We develop a plan. We sent it out for a bid this year for a new contractor. Because the prior one was unsatisfactory, and we develop our budget on it, which I think is $72,000[.00] this year.

THE COURT: And does the . . . Board do that as part of its duties as the overseeing Board?

THE WITNESS: Yes.

R.R. at 426a-427a.

Based on all of the evidence presented at the hearing, the trial court concluded:

At the times complained of by the [McCabes,] some of the common area elements were still under control of the developer and not the [] Association.

Some of the areas were mowed short, some of the areas were longer, and some of the areas are rarely mowed and some of the areas are not maintained at all and kept as a natural area. This is a decision of the . . . [B]oard of the [A]ssociation and not of the individual homeowners.

Each individual unit owner cannot determine how the common element areas are to be maintained so long as they are maintained in a reasonable manner. The [McCabes] have not met their burden of proof to establish that the

18

maintenance of the common element area was not in accordance with what is required under the [Declaration]. Determination of the common area elements by the . . . [B]oard is pursuant to the [Act]. That [A]ct and the bylaws establish the powers of [sic] duties of the . . . [B]oard and it is the . . . [B]oard that is to regulate the use, maintenance, repair, replacement, and modification of the common elements.

March 23, 2016 Order at 2-3.

The McCabes assert that Dimitri's acknowledgement that "maintenance or maintained" does not "include homeowners being subject to ticks, bugs and snakes" is an admission that the Association failed to meet "the standard of maintenance it had chosen for itself." R.R. at 423a; McCabes' Br. at 29. We disagree with the McCabes' interpretation of the aforementioned exchange. The question was unclear at best, and Dimitri's response was not an admission that the Association failed to meet its responsibilities. We decline to interpret the ambiguous question and answer to mean that the Association concedes that it failed to maintain common areas **any time** a homeowner experiences ticks, bugs and/or snakes. Further, even if the McCabes' allegations that they were "subject to ticks, bugs, and snakes" is true, there is no evidence that the Association's alleged failure to maintain the Common Area caused an increase in ticks, bugs and snakes. R.R. at 423a.

Upon review of the record evidence and the trial court's opinion, we discern no error of law or abuse of discretion and, thus, affirm the trial court's order denying the McCabes' Post-Trial Motion.

For all of the above reasons, the trial court's orders are affirmed.

_____
ANNE E. COVEY, Judge

Judge McCullough did not participate in the decision in this case.

19

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Logans' Reserve Homeowners'    :
Association                     :
                                :
                                :
        v.                      :
                                :
Jeffrey McCabe and Jennifer McCabe,  :    No. 820 C.D. 2016
                    Appellants  :

Logans' Reserve Homeowners'    :
Association                     :
                                :
                                :
        v.                      :
                                :
Jeffrey McCabe and Jennifer McCabe,  :    No. 821 C.D. 2016
                    Appellants  :


## O R D E R


AND NOW, this 4ᵗʰ day of January, 2017, the York County Common Pleas Court's April 22, 2014, February 17, 2016 and April 15, 2016 orders are affirmed.


_____
ANNE E. COVEY, Judge