# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Michael J. Walters; Michael J. : <br>
Walters and Roseanne Walters, : <br>
husband and wife; Mark H. Attix; : <br>
Frederick John Bartek; Charles W. : <br>
Buttz and Teresa C. Buttz, husband : <br>
and wife; Joellen Chadwick; Mary : <br>
Ellen Christman; Brian Colfer and : <br>
Alicia Colfer, husband and wife; : <br>
David T. Councilor and Debra A. : <br>
Councilor f/k/a Debra Litchult, : <br>
husband and wife; David T. : <br>
Councilor, Administrator of the : <br>
Estate of Theodore G. Councilor; : <br>
Mary Alchermes-Dilger, Joseph D. : <br>
Alchermes, and Christopher B. : <br>
Alchermes; Mark E. Elvin and : <br>
Shauna D. Elvin, husband and wife; : <br>
Susan E. Esterhay and Linda M. : <br>
Smith; Max H. Feldman and Kelee A. : <br>
Monahan-Feldman, husband and : <br>
wife; Leo J. Finnegan; Richard E. : <br>
John and Marilyn P. John, husband : <br>
and wife; Marilynn Ann Johnson; : <br>
Howard A. Kellner and Donna M. : <br>
Kellner, husband and wife; Douglas : <br>
D. Kelly; Russell R. Kice; John O. : <br>
Klinger and Brenda Klinger, husband : <br>
and wife; Mountain Home Enterprises : <br>
LLC; Erik Peterson and Gillian : <br>
Peterson, husband and wife; Clarke : <br>
Reid and Joanne Reid, husband and : <br>
wife; Patricia A. Russo; Edward M. : <br>
Satterthwaite; Jacob E. Seip and : <br>
Phyllis A. Seip, husband and wife; : <br>
Thomas D. Shore; Leslie D. Sopko; : <br>
Stags Leap Properties LLC; Elaine J. : <br>
Vula; William C. Wolfe, : <br>
              Appellants : <br>
: <br>
    v. : <br>

Buck Hill Falls Company;                    :
Lot and Cottage Owners'                     :        No. 52 C.D. 2019
Association of Buck Hill Falls               :        Argued:  December 12, 2019

BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
           HONORABLE P. KEVIN BROBSON, Judge
           HONORABLE ANNE E. COVEY, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                                 FILED:  January 10, 2020


          Michael J. Walters, Michael J. and Roseanne Walters, Mark H. Attix, Frederick John Bartek, Charles W. and Teresa C. Buttz, Joellen Chadwick, Mary Ellen Christman, Brian and Alicia Colfer, David T. Councilor, individually, Debra A. Councilor f/k/a Debra Litchult, David T. Councilor as Administrator of the Estate of Theodore G. Councilor, Mary Alchermes-Dilger, Joseph D. and Christopher B. Alchermes, Mark E. and Shauna D. Elvin, Susan E. Esterhay, Linda M. Smith, Max H. Feldman and Kelee A. Monahan-Feldman, Leo J. Finnegan, Richard E. and Marilyn P. John, Marilynn Ann Johnson, Howard A. and Donna M. Kellner, Douglas D. Kelly, Russell R. Kice, John O. and Brenda Klinger, Mountain Home Enterprises LLC, Erik and Gillian Peterson, Clarke and Joanne Reid, Patricia A. Russo, Edward M. Satterthwaite, Jacob E. and Phyllis A. Seip, Thomas D. Shore, Leslie D. Sopko, Stags Leap Properties LLC, Elaine J. Vula, and William C. Wolfe (collectively, Appellants) appeal from the Monroe County Common Pleas Court's (trial court) September 4, 2018 order denying Lot and Cottage Owners' Association of Buck Hill Falls' (Association)[1] summary judgment motion, granting Buck Hill Falls Company's (Company) summary judgment motion and dismissing the action.  There are seven

---

[1] Association, formed in 1909 and registered in 1976 as a non-profit association, is a **voluntary membership** association whose purpose is to preserve the Buck Hill Falls Community's character, spirit and traditions.  *See* Reproduced Record (R.R.) at 6a.

2

issues before this Court: (1) whether the General Declaration of Rights, Easements, Covenants, Conditions, Affirmative Obligations and Restrictions Applicable to the Buck Hill Falls Community (Community) (General Declaration) authorizes the imposition of fees for Company's non-community-based services located in the Community's common area (Common Area);[2] (2) whether the subject assessments violate the Uniform Planned Community Act (UPCA), 68 Pa.C.S. §§ 5101-5414; (3) whether genuine issues of material fact remain, rendering summary judgment inappropriate; (4) whether a 1996 settlement agreement between Company and Association altered Company's authority to impose fees and dues and whether Company's course of conduct pursuant to its obligations under the 1996 settlement agreement resulted in an implied contract between Company and the Community's residents; (5) whether the trial court properly concluded that an agreement's no-litigation clause prevented the agreement's introduction; (6) whether the trial court erred in failing to find the current dues process inequitable, in that a publicly traded for-profit corporation has the power to tax Community members by increasing dues; and (7) whether the trial court's decision bars future challenges to Company's assessed dues.[3] After review, we affirm.

The Community is a private, residential community located in Monroe County, Pennsylvania, consisting of approximately 305 cottages and a number of

---

[2] Section 1.9 of the General Declaration defines "Common Area" as

> all that land (including the associated improvements) designated in Exhibit 'B'[, *see* R.R. at 204a,] to and all land that is not lots or living units in the development area and existing residential area this [General] Declaration or in any supplementary declaration which is or shall be owned by company subject to the common use and enjoyment of the owners.

R.R. at 174a-175a (capitalization omitted).

[3] Appellants presented 16 issues in their Statement of the Questions Involved. *See* Appellants' Br. at 4-7. These issues are subsumed in this Court's restatement of the issues.

undeveloped lots. Company is a for-profit corporation, created in 1900, which owns and manages all of the Common Area and amenities. Virtually all of the Community's shareholders are either current or former Community residents. *See* Reproduced Record (R.R.) at 160a; *see also* R.R. at 151a. Company owned the Buck Hill Falls Inn (Inn), which it sold to third parties and ultimately closed. Many Community amenities, including the golf course, lawn bowling and tennis, were attractions used by both the Inn and the Community. Company also permits use of the amenities by the general public for a fee, but the charged fees are insufficient to sustain the operations.

The trial court's opinion succinctly describes the lengthy and litigious history among Appellants, Association and Company:

> There have been many prior actions to determine the rights and responsibilities of [] Company, [] Association, and owners of real estate within the Community [(Owners)]. The deeds to most, if not all the properties in the Community incorporate certain covenants and restrictions set forth in the [General Declaration, *see* R.R. at 331a] and 'Supporting Declaration II.' Both documents have been recorded in the Monroe County Recorder of Deeds office. The General Declaration provides that every owner within the Community has an easement to use and enjoy the [C]ommon [A]reas of the development. In return, [] Company may charge [Owners] for the costs of funding the [C]ommon [A]reas and for capital improvements. The obligation of [Owners] to pay dues to [] Company has already been upheld by this Court. The proper calculation of these dues continues to be an issue between the parties and has resulted in the present litigation.
>
> In 1995, [] Association brought a declaratory judgment suit against [] Company. In order to end that litigation amicably, the parties entered into an agreement (hereinafter '1996 Agreement') and appendix (hereinafter '1996 Appendix'). The 1996 Agreement recognized the services [] Company provides to the Community and the obligation of the residents to pay for them. As part of the 1996 Agreement, [] Company also agreed to seek 'advice and

4

support' from [] Association in setting yearly dues. []This was to be accomplished through the creation of a Joint Finance Committee consisting of two members nominated by [] Company, two members nominated by [] Association, and one impartial member. The Joint Finance Committee would propose and recommend the amount of dues to be levied to the board of [] Company. According to the 1996 Agreement, [] Company was not required to accept the recommendation of the Joint Finance Committee, but 'agree[d] to meet and confer with the Joint [Finance] Committee in an effort to establish an agreed upon level of [d]ues, prior to adoption of a level of [d]ues other than recommended.' The parties also agreed to be bound by a 'dues formula' found in the 1996 Appendix. The Appendix does not establish a hardline formula, but is built on certain 'cost centers.' The costs of 'General and Administrative Expenses' and 'Community Services'[4] were to be assessed

---

[4] The term "Community Services," is not defined in the General Declaration, but it is referenced and defined in the 1996 Agreement as follows:

Such services include but are not limited to providing general administration, road maintenance, trash collection, security, maintenance for common areas such as the Community Flower Garden, bowling greens, Glenn and Falls, Jenkins Woods, Metzgar's Farm and **such additional, facilities as may be determined from time to time to benefit the entire** [] **Community**. These above mentioned services are hereafter defined as 'Community Services' to distinguish them from other services such as recreational facilities, water and sewer services, individual property inspections, and other services, all of which are billed to individual customers based on usage.

R.R. at 368a (emphasis added). The 1996 Appendix further explained:

Company provides a broad array of services including, but not limited to, security, garbage and trash removal, road maintenance and snow plowing. [] Company also preserves and maintains certain lands and properties for the use and benefit of the community. These include the community Flower Garden, Metzg[a]r[']s Farm, the Bowling Greens, the Glen[n] and Falls, the Tennis Tea meeting facility and certain protective lands that serve as an environmental buffer for the community.

[] Company has adopted an accounting methodology based on 'cost centers.' **One such center is 'Community Services' under which are grouped the Direct Costs associated with providing to the**

5

in proportion to both [O]wners of developed and undeveloped properties. However sports amenities [(defined in the Appendix as 'golf, tennis, pool, fishing etc.)] were to be supported by fees charged to individual users with the 'Company's intention to manage these [sports] amenities to assure each is, at the very least, self-sustaining by the year 2000.' [1996 Appendix, *see* R.R. at 375a.] The members of [] Association properly amended the organization's by-laws to adopt the 1996 Agreement.[5]

In 2004, [] Company and [] Association once again came together and issued a 'Restated and Amended Agreement Between [Company] and [Association]' (hereinafter 'the 2004 Agreement' and '2004 Appendix')[.] This amendment was not voted on by the members of [] Association. The 2004 Agreement is substantially similar to its 1996 counterpart with only a few changes. The 2004 Appendix put into writing certain changes in the dues formula. In response to the failure to attract outside usage, the 2004 Appendix added the sports amenities to 'Community Services,' assessed to every owner. Other

---

**community the services described in the preceding paragraph**. Such costs include salaries, benefits, and associated payroll costs, taxes, contracted services, insurance premiums related to community services, uncollectible [d]ues billings, telephone charges, materials, water, sewer and other expenses associated with providing Community Services.

R.R. at 374a (emphasis added). According to Appellants, although not explicitly defined in the 1996 Agreement, the term "Non-Community Services Business Activities" was effectively defined therein as anything not included in Community Services. *See* Appellants' Br. at 21.

5 In 2000, Company adopted new Rules and Regulations (2000 Rules and Regulations). According to a confidential internal Company legal memorandum,

[t]he [2000] Rules and Regulations were approved by a supermajority of outstanding shares and a large majority of homeowners in August 2000. They are based on the [General Declaration] and were adopted primarily to bring consistency to the dues paying obligations of all cottage owners. 187 cottages are under the 1986 Covenants. Most, if not all, deeds with pre-1986 Covenants or original deed restrictions do not have a dues paying provision, but have a provision requiring compliance with Company rules and regulations that are adopted by the shareholders, as the [2000] Rules and Regulations were.

R.R. at 827a.

6

changes that were made related to parts of the 1996 Agreement which had proved untenable. All parties agree that the amount of dues assessed to [Owners] has increased considerably since 1996.

On March 16, 2015, [Appellants] filed a complaint in this matter. [] [Appellants] are a group of former and current [O]wners of homes in the Community who believe they have been systematically overcharged by [] Company. After preliminary objections by [Company and Association], [Appellants] filed an Amended Complaint on June 29, 2015. A Second Amended Complaint followed on October 15, 2015, as a result of additional objections filed by [Company and Association]. [Appellants] raise a number of grievances regarding how dues are formulated by [] Company which are allegedly in violation of the 1996 Agreement.

Trial Ct. Op. at 3-5 (citations and footnote omitted).

Appellants alleged in the Second Amended Complaint that Company substantially complied with the 1996 Agreement from 1996 through November 1, 2005, and established the parties' course of dealing in calculating the formula used to charge dues, fees and assessments.[6] Appellants sought recovery of allegedly excessive charges between Company's 2006 fiscal year and its 2015 fiscal year as a result of Company's "failure to adhere to the various sets of covenants, as clarified by the 1996 Agreement[.]" R.R. at 12a. In other words, Appellants alleged that Company overcharged residents by including fees for Non-Community Services business activities (such as sports amenities) in the dues calculations, despite having

---

[6] Notwithstanding, Appellants averred that, during that same period, Company violated the 1996 Agreement in two ways: First, Company failed to apportion the Community Services costs between and among developed and undeveloped lots, instead charging all costs only to developed lots; and, second, by entering into the 2004 Agreement which improperly attempted to amend Company's rights, requiring Community Services costs be allocated only to developed lots, and revising the definition of Community Services to include additional activities such as the activity center, fishing and the swimming pool complex.

7

previously engaged in a course of conduct consistent with the 1996 Agreement to charge only users rather than the Community at large.

On July 30, 2018, both Company and Association filed summary judgment motions. On September 4, 2018, the trial court granted Company's summary judgment motion and dismissed the action.[7] The trial court concluded that neither the 1996 Agreement nor the 2004 Agreement constituted enforceable amendments to the General Declaration "especially when such document[s are] not labeled as [] amendment[s], do[] not appear to have been meant as [] amendment[s], and do[] not follow the amendment procedures clearly outlined within the recorded covenants themselves." Trial Ct. Op. at 13. In addition, the trial court declined to find an implied contract based on Company's course of conduct. Appellants appealed to this Court.[8]

**Discussion**

Initially,

'summary judgment is appropriate only in those cases where the record clearly demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.' *Atcovitz v. Gulph Mills Tennis Club, Inc.*, . . . 812 A.2d 1218, 1221 ([Pa.] 2002); Pa.R.C.P. [No.] 1035.2(1). The trial court must take all facts of record and reasonable inferences therefrom in a light most favorable to the non-moving party. In so doing, the trial court must resolve all doubts as to the existence of a genuine issue of material fact against the moving party, and, thus, may only grant summary judgment 'where the right to such judgment is clear and free from all doubt.' *Summers v. Certainteed Corp.*, . . . 997 A.2d 1152, 1159 ([Pa.] 2010).

---

[7] The trial court denied Association's summary judgment motion.

[8] "An appellate court may reverse a grant of summary judgment if there has been an error of law or an abuse of discretion." *Saksek v. Janssen Pharm., Inc. (In re Risperdal Litig.)*, ___ A.3d ___, ___, (Pa. Nos. 22 EAP 2018, 23 EAP 2018, filed November 20, 2019), slip op. at 8.

*Saksek v. Janssen Pharm., Inc. (In re Risperdal Litig.)*, ___ A.3d ___, ___ (Pa. Nos. 22, 23 EAP 2018, filed November 20, 2019), slip op. at 8-9 (citation omitted). "The moving party has the burden of proving the non-existence of any genuine issue of material fact." *Kee v. Pa. Tpk. Comm'n*, 722 A.2d 1123, 1125 (Pa. Cmwlth. 1998). "However, to preclude summary judgment, the non-moving party must establish that a genuine issue of material fact exists." *United Transp. Union v. Pa. Pub. Util. Comm'n*, 68 A.3d 1026, 1033 (Pa. Cmwlth. 2013).

Here, Section 3.2 of the General Declaration describes Company's duties, in pertinent part:

> Company shall in addition to all obligations, duties and functions as are assigned to it by other provisions of this [General] Declaration have the obligations, duties and functions (subject to the provisions of this [General] Declaration), to do and perform each and every of the following for the benefit of the Owners[9] and for the maintenance, administration and improvement of the Common Area.
>
> (a) <u>Operation and Maintenance of Common Area</u>. To operate, maintain, and otherwise manage or provide for the operation, maintenance, and management of the Common Area, together with all easements for operation and maintenance purposes and for the benefit of the Owners of over and within the Common Area; and (as limited by the [General] Declaration) to keep all improvements of whatever kind and for whatever purpose from time to time associated with the Common Area in good order, condition and repair . . . .

R.R. at 179a (capitalization omitted). Section 3.3 of the General Declaration, which describes the "<u>Powers and Authority of Company</u>", provides:

---

[9] Section 1.9 of the General Declaration defines "Owner" as "the record owner . . . , whether one or more persons or entities, of a fee simple title to a [l]ot or [l]iving [u]nit, his, her or its heirs, successors or assigns." R.R. at 176a.

Company shall have the power to do any and all lawful things which may be authorized, required or permitted to be done by Company under this [General] Declaration, and to do and perform any and all acts which may be necessary or proper for or incidental to the exercise of any of the express powers of Company including the following which are listed without intent to limit the powers of [] Company.

(a) Dues, Fees, and Assessments. To levy dues, fees, and assessments (the Charges) on [] Owners of lots and living units and to enforce payment of charges, all in accordance with the provision of this [General] Declaration.

. . . .

(i) Other Powers. To exercise any other power which promotes (i) the recreation, health, safety and welfare of [] Owners, **or** (ii) **the improvement, operation and maintenance of the Common Area**.

R.R. at 181a (bold emphasis added; capitalization omitted). Section 4.1 of the General Declaration specifies, in relevant part:

(a) . . . [E]ach Owner and person holding title to any lot or living unit by acceptance of a deed, whether or not it shall be so expressed in such deed, is deemed to covenant and agree, for each lot, or living unit and improvements owned, to pay to Company: (1) annual dues and fees, (2) dues and fees specified in Supporting Declaration (if any) and (3) special assessments. These charges shall be established, made and collected as provided below.

(b) The dues, fees and Special Assessments, together with interest, costs of collection, and reasonable attorneys' fees, shall be legal obligations which run with the land and shall be continuing liens upon the lot or living unit against which each charge is made.

R.R. at 184a (capitalization omitted).

Section 4.2 of the General Declaration, which describes Company's authority to collect dues and fees, states:

**Annual dues and fees levied by Company shall be used to promote** the recreation, health, safety and welfare of []

10

> Owners, **the improvement, operation and maintenance of the Common Area, the performance of the duties and exercise of the powers of Company as set forth in this [General] Declaration, the payment of proper expenses of Company of its duties and exercise by it of its powers pursuant to this [General] Declaration**, and the establishment of restricted funds of [] Company for the maintenance, repair and replacement of roads, paths and other improvements upon the Common Area.

R.R. at 184a (capitalization omitted; emphasis added).[10]  Further, Section 1.22 of the General Declaration defines "Recreational Facility" as "any fee-based, limited access, non-residential improvement in the Common Area, including, but not limited to, the golf courses, tennis courts, pool, bowling greens, falls and other similar facilities."[11] R.R. at 176a (capitalization omitted).  Section 6.3 of the General Declaration, titled "Privilege to Use Recreation Facilities," provides:

> (a) Each Owner of a lot or living unit and the single family of each Owner are hereby granted a limited privilege to use any Common Area, provided that the Owner:
>
> . . . .
>
> (iii) Pays recreational fee(s) as established by Company to operate the Recreational Facility.

R.R. at 194a (capitalization omitted).

---

[10] In addition to the dues and fees described, Section 4.3 of the General Declaration permits Company to

> levy, during any calendar year, Special Assessments . . . applicable to that year only for the purpose of protecting the Common Area, defraying, in whole or in part, the cost of any construction, reconstruction, or unexpected repair or replacement of a capital improvement upon the Common Area, including the necessary fixtures and personal property related to these improvements.

R.R. at 184a (capitalization omitted).

[11] Appellants do not dispute that Company's recreational facilities and food service operations, which are the subject of this dispute, are located within the Common Area's geographic boundaries as designated in Exhibit "B".

# I. General Declaration Authority

Appellants first argue that the trial court erred when it held that the General Declaration gives Company a clear right to impose dues and assessments at its sole discretion, where Company seeks to impose such dues for the operation of non-Community Services businesses. They specifically contend:

> Nothing in the [General Declaration] can reasonably be read to suggest or even imply that those Covenants give [] Company the authority to charge [O]wners for the operating losses and other capital requirements of [] Company's non-Community Services businesses.

Appellants' Br. at 18. Additionally, quoting Section 4.2 of the General Declaration's provision "obligat[ing] owners whose properties are subject to [the] Covenants, to pay charges that 'shall be used to promote [activities in the Common Area] . . .'", Appellants assert that "the fact that charges 'shall be used for [activities in the Common Area'] doesn't say, and can't reasonably be read to say '. . . **to pay the operating costs and other capital requirements** of [] Company's non-Community Services business that are operated in or on the Common Area.'" Appellants' Br. at 19 (emphasis added) (quoting Section 4.2 of the General Declaration).

Appellants omit relevant portions of Section 4.2 of the General Declaration. In particular, that provision does not, as Appellants represent, merely impose fees and dues to promote "activities in the Common Area," Appellants' Br. at 19, but, rather, provides that, in addition to using dues and fees to promote Owners' recreation, health, safety and welfare, such dues and fees are **also** for the purpose of

> the improvement, *operation and maintenance* of the Common Area, **the performance of the duties and exercise of the powers of Company** as set forth in this [General] Declaration, **the payment of proper expenses of Company of its duties and exercise by it of its powers** pursuant to this [General] Declaration, and the

12

> establishment of restricted funds of [] Company for the maintenance, repair and replacement of roads, paths and other improvements upon the Common Area.

R.R. at 184a (bold and italic emphasis added; capitalization omitted). Under the General Declaration, a "Recreational Facility" is an "improvement in the Common Area," R.R. at 176a (capitalization omitted), and Company's powers to assess fees and dues include "the improvement, operation and maintenance of the Common Area." R.R. at 182a (capitalization omitted).

Although Section 6.3 of the General Declaration grants Owners a limited privilege to use recreation facilities if they pay "[r]ecreational fee(s) as established by Company to operate the Recreational Facility[,]" it does not direct that the recreational fees must be the **sole** source of funds to operate and maintain them. R.R. at 194a (capitalization omitted). Separate and apart from Company's authority under Section 6.3 of the General Declaration to collect recreational fees, Section 4.2 of the General Declaration permits Company to collect fees and dues **not only** for Owners' recreation, health, safety and welfare, but also for "the improvement, operation and maintenance of the Common Area," **and Company's performance of its duties and the exercise of its powers** under the General Declaration. R.R. at 184a (capitalization omitted). Clearly, it is within Company's powers to operate and engage in the non-Community Services businesses in the Common Area. Section 4.2 of the General Declaration permits Company to impose fees, therefor. Thus, this Court disagrees with Appellants' broad assertion that "[n]othing in the [General Declaration] can reasonably be read to suggest or even imply that [the General Declaration] give[s] [] Company the authority to charge [O]wners for the operating losses and other capital requirements of [Company's] non-Community Service businesses." Appellants' Br. at 18. Instead, the General Declaration authorizes the imposition of fees and dues for such purposes. Thus, Appellants' arguments are without merit.

13

## II. UPCA Violation

Appellants next contend that Company's imposition of dues and assessments contravenes the UPCA.[12] In response, Company asserts that, because Appellants failed to raise the issue before the trial court, it is waived. Appellants do not deny that they did not raise the issue, but retort in their Reply Brief that since Company failed to cite any legal authority in its brief to support its waiver argument, as Pennsylvania Rule of Appellate Procedure (Rule) 2119(a) requires, Company's waiver argument is itself waived. *See Browne v. Dep't of Transp.*, 843 A.2d 429, 435 (Pa. Cmwlth. 2004) ("At the appellate level, a party's failure to include analysis and relevant authority results in waiver.").

This Court agrees that Company failed to include supporting authority for its waiver argument. Notwithstanding, this Court has explained that "[t]he appellate court may sua sponte refuse to address an issue raised on appeal that was not raised and preserved below[.]" *Siegfried v. Borough of Wilson*, 695 A.2d 892, 894 (Pa. Cmwlth. 1997). The failure to raise an issue before the trial court deprives the trial court the opportunity to address the issue in the first instance. Rule 302(a) clearly provides that "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). Thus, this Court deems the UPCA argument waived.

---

[12] Appellants frame the argument as: "There are genuine issues of material fact as to whether [] Company's levy of dues and assessments is in contravention to the [UPCA]." Appellants' Br. at 29. However, whether Company's levy of dues violates the UPCA is a legal question rather than a question of fact. *See Capital Acad. Charter Sch. v. Harrisburg Sch. Dist.*, 934 A.2d 189, 192 (Pa. Cmwlth. 2007) ("The meaning of a statute is a question of law[.]").

14

### III. Disputed Issues of Material Fact

Appellants next assert that the trial court erred by granting summary judgment where genuine issues of material fact remained.[13]  Summary judgment may be granted only where it is clear there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *Atcovitz.*  "A material fact is one that directly affects the outcome of the case."  *Logans' Res. Homeowners' Ass'n v. McCabe*, 152 A.3d 1094, 1099 n.8 (Pa. Cmwlth. 2017) (quoting *Kenney v. Jeanes Hosp.*, 769 A.2d 492, 495 (Pa. Super. 2001)).

Appellants raise the following allegedly disputed material facts: (1) that Appellants asserted that resale certificates issued by Company limit Company's ability to collect fees, *see* Appellants' Br. at 4, Issue 2; (2) that Company's levy of dues and fees contravenes the UPCA, *see id.*, Issue 3; (3) that Appellants alleged the 1996 Amendment is an unrecorded amendment to the General Declaration, *see id.*, Issue 4; (4) that there is evidence Appellants were presented with the unrecorded 1996 Agreement at purchase and relied thereon, *see id.*, Issue 5; (5) that the 1996 Agreement's language establishes a hard-line dues formula, *see* Appellants' Br. at 5, Issue 7; (6) that the 2004 Agreement added recreational facilities to the Community Services cost center, *see id.*, Issue 8; (7) that an implied contract was formed by the parties' course of conduct and the implied contract was violated, *see id.*, Issue 9; (8) that the 1996 Agreement's provisions were changed by the 2004 Agreement, *see id.*, Issue 10; (9) that the contracting parties clearly represented that the 1996 Agreement

---

[13] Appellants' brief contains ten separately addressed issues alleging disputed material facts. Despite that Appellants' Statement of the Questions Involved and their Brief's internal headings raise such issues, the discussions thereunder often do not describe the purportedly disputed facts. Under some such headings, Appellants merely argue the trial court misconstrued Appellants' arguments and, under other headings, Appellants proffer substantive legal arguments disputing Company's ability to impose the subject fees, rather than identifying genuine issues of disputed material fact.  Further, Appellants allege issues of disputed fact pertaining to the 1996 Agreement and 2004 Agreement despite that their action is based not on those agreements, but on an implied contract.  This Court will attempt to address each alleged disputed fact individually.

was not binding and could not be used for litigation purposes, *see* Appellants' Br. at 6, Issue 12; and (10) what constitutes the relationship Appellants chose to engage in when purchasing their properties. *See id.*, Issue 13.

First, whether Appellants argued to the trial court that Company-issued resale certificates limit Company's ability to collect fees, is not a disputed material fact. The existence of a genuine issue of material fact pertains to the evidence, not the party's argument.[14] Whether Appellants made particular arguments to the trial court, and whether the trial court misapprehended Appellants' arguments, are not disputed material facts. *See Logans' Res.* Second, whether the levy of dues and fees contravenes the UPCA, is a legal determination. Further, as explained, *supra*, Appellants have waived that issue. Third, whether Appellants alleged that the 1996 Agreement is an unrecorded amendment to the General Declaration is not a disputed material fact. Appellants deny arguing to the trial court that the 1996 Agreement is an unrecorded amendment to the General Declaration and assert that the trial court erred in finding that the Appellants alleged such. However, as stated above, whether Appellants proffered a particular argument does not constitute a disputed genuine issue of material fact.

This Court acknowledges that whether the unrecorded 1996 Agreement was presented to Appellants at purchase and they relied thereon, may be a disputed material fact. However, Appellants make no supporting argument in their brief that any Appellants were presented with the 1996 Agreement and/or relied thereon when

---

[14] "[I]t is well[]settled that arguments of counsel are not evidence . . . ." *Commonwealth v. Puksar*, 951 A.2d 267, 280 (Pa. 2008).

purchasing their properties.[15] Thus, that argument is waived.[16] *See Browne.*

With respect to whether the 1996 Agreement's language establishes a hard-line dues formula, the Pennsylvania Superior Court has held that "[t]he enforceability of settlement agreements is determined according to principles of contract law." *Mastroni-Mucker v. Allstate Ins. Co.*, 976 A.2d 510, 517 (Pa. Super. 2009) (quoting *Ragnar Benson, Inc. v. Hempfield Twp. Mun. Auth.*, 916 A.2d 1183, 1188 (Pa. Super. 2007)). Moreover, "the interpretation of contracts is a question of law." *Toll Naval Assocs. v. Chun-Fang Hsu*, 85 A.3d 521, 529 (Pa. Super. 2014). Thus, the fifth alleged factual dispute is a legal one rather than a factual one. Similarly, whether the 2004 Agreement added recreational facilities to the Community Services cost center, involves contract interpretation and, thus, it is a legal determination.

Regarding whether the parties' course of conduct created an implied contract that was violated, the Pennsylvania Supreme Court has explained that "whether an implied contract can be derived from a set of underlying facts represents a question of law." *Konyk v. Pa. State Police*, 183 A.3d 981, 988 n.6 (Pa. 2018). Appellants claim only that the trial court misinterpreted their argument stating: "[Appellants] are not arguing breaches based on non-compliance with an actual contract in this litigation. [Appellants] have argued throughout this litigation that [] Company breached the implied contract between [] Company and [] [O]wners, including [Appellants]." Appellants' Br. at 45. Importantly, Appellants point to no

---

[15] Appellants' entire discussion relative to this issue is: "The trial court was apparently under the impression that [Appellants] here were arguing that the 1996 Agreement was an unrecorded amendment to the covenants. Clearly it was not, and [Appellants] have never so argued." Appellants' Br. at 33. Appellants then reference their prior argument pertaining to whether the 1996 Agreement was an amendment to the General Declaration. There is no discussion of any reliance or of any facts pertaining thereto.

[16] Further, a trial court's alleged misapprehension of a party's argument does not constitute a disputed issue of material fact.

disputed factual issues in their argument on this issue. Appellants reference their prior argument pertaining to whether disputed facts remain regarding whether the 1996 Agreement established a hard-line dues formula.

Next, whether the 1996 Agreement's provisions were changed by the 2004 Agreement, involves contract interpretation and, thus, is a legal determination. Relative to whether the contracting parties clearly represented that the 1996 Agreement was not binding and could not be used for litigation purposes, the 1996 Agreement contains the following explicit and unambiguous no-litigation clause:

> [] Company and []Association acknowledge that in the event of litigation in connection with any issue addressed by this [A]greement, neither this settlement agreement nor any term of this settlement agreement shall be submitted as evidence on any issue in any proceeding. []Association and []Company acknowledge that this agreement constitutes an offer and acceptance of settlement which is not admissible in evidence in any proceeding.

R.R. at 224a. Appellants could have discovered this clause if they had conducted a simple document review. Moreover, Appellants offer no authority requiring Company to take any action to "unambiguously let it be known that the 1996 Agreement was not binding and could not be used for litigation purposes." Appellants' Br. at 52 (quoting Trial Ct. Op. at 18).

Finally, Appellants' tenth alleged factual dispute – "what constitutes '. . . the relationship [Appellants] chose to engage in when purchasing their properties[,]'" Appellants' Br. at 54 (quoting Trial Ct. Op. at 20) – pertains to the trial court's conclusion that Appellants purchased properties in the Community with various amenities owned and controlled by the publicly owned Company and, thus, consistent with deed restrictions and covenants, the General Declaration and common law, agreed to pay their share of the costs to maintain the amenities. Appellants argue that while they agreed to pay Community Service costs, they did not agree to pay for the

18

non-Community Services activities. Importantly, Appellants do not specifically identify any disputed issues of material fact in their discussion thereof. Accordingly, this Court concludes that Appellants have not identified any remaining genuine issues of disputed fact.

### IV. 1996 Agreement and 2004 Agreement and Implied Contract

Appellants next argue that the trial court erred when it granted summary judgment because Company's course of conduct in adhering to the 1996 Agreement provisions between Company and Association created an implied contract between Company and Appellants.

Appellants assert that the "**signing of the** [**1996**] **Agreement** and the parties' representations to the Community, **marked the beginning of the course of dealing and the implied contract between** [] **Company and the** [O]**wners**."[17] Appellants' Br. at 26. Appellants assert that "Company represented to the Community at the time the 1996 Agreement was entered into that dues and assessments, going forward, would be determined in accordance with the provisions of the 1996 Agreement, thereby establishing the implied contract between [] Company and [Owners.]" Appellants' Br. at 12. According to Appellants, they "are not objecting to [] Company's charges for Community Services that were determined on the basis of provisions of the 1996 Agreement, but rather are seeking to enforce the provisions of the implied contract that requires charges to be determined on the basis of the provisions of the 1996 Agreement."[18] *Id*. at 27. In other words, Appellants urge this Court to hold that the implied contract requires Company to

---

[17] Appellants do not argue that Company breached the 1996 Agreement or the 2004 Agreement, since Appellants were not parties to those agreements.

[18] Notwithstanding, Appellants acknowledge that Company did not comply with all of the 1996 Agreement's provisions.

19

exclude charges for non-Community Services from dues and assessments, consistent with Company's conduct in complying with the 1996 Agreement.

Notably, the 1996 Agreement's terms for calculating dues are flexible. As the trial court explained:

> [T]he language of the 1996 Agreement does not establish a hard line formula for calculating dues. On the contrary, the document states: '[c]onsideration must be given to potential future variations in costs. . . The cumulative experience gained over the years will help fine tune each year's budget and best assure common understanding between the parties engaged in the budget and dues setting process.' [R.R. at 227a.] This 'cumulative experience' clearly began to take form when prior to 2004, [] Company started to add sports and recreational amenities, such as the pool, to the dues formula while also opening their use to all [O]wners.

Trial Ct. Op. at 16. With respect to sports amenities, the 1996 Agreement provides: "The cost incurred to provide various sports amenities (golf, tennis, pool, fishing etc.) **should** be **supported** by fees charged directly to the users of these amenities. It is [] Company's **intention** to manage these amenities to assure that each is, at the very least, self-sustaining by the year 2000." R.R. at 227a (emphasis added). A plain reading of this provision in the 1996 Agreement reveals that it does not prohibit Company from including expenses for such sports amenities in the Owners' dues. Rather, it expresses Company's belief that the sports amenities **should** be supported (to some degree) by user fees, and declares an **intention** that the sports amenities would ultimately be self-sustaining by the year 2000. In fact, the provision necessarily acknowledges that the sports amenities will be supported, in part, by funding other than user fees prior to the year 2000.

The Pennsylvania Supreme Court has explained that "[a] contract implied in fact is an actual contract which arises where the parties agree upon the obligations to be incurred, but their intention, instead of being expressed in words, is

inferred from acts in the light of the surrounding circumstances." *Liss & Marion, P.C. v. Recordex Acquisition Corp.*, 983 A.2d 652, 659 (Pa. 2009) (quoting *Elias v. Elias*, 237 A.2d 215, 217 (Pa. 1968); *see also Crawford's Auto Ctr., Inc. v. Pa. State Police*, 655 A.2d 1064 (Pa. Cmwlth. 1995). "While a contract implied-in-fact may arise when two parties impliedly agree to perform certain duties, **such a contract, as all others, will only arise when there is an exchange of legal consideration**." *Commonwealth Fed. Sav. & Loan Ass'n v. Pettit*, 586 A.2d 1021, 1024 (Pa. Cmwlth. 1991) (emphasis added). "The question [of] whether an undisputed set of facts establishes a contract is a matter of law." *Temple Univ. Hosp., Inc. v. Healthcare Mgmt. Alts., Inc.*, 764 A.2d 587, 593 (Pa. Super. 2000).

In contrast, "[a] contract implied-in-law, or quasi contract, imposes a duty despite the absence of either an express or implied agreement, when one party receives an **unjust enrichment** at the expense of another party." *Dep't of Gen. Servs. v. Limbach Co.*, 862 A.2d 713, 720 n.11 (Pa. Cmwlth. 2004), *aff'd*, 895 A.2d 527 (Pa. 2006) (emphasis added).

Appellants reference *Meadow Run & Mountain Lake Park Ass'n v. Berkel*, 598 A.2d 1024 (Pa. Super. 1991), to support their position that they are parties to an implied contract. In *Meadow Run*, lot owners challenged the homeowner association's annual assessment for the repair of dams and roads used by all lot owners. The trial court held that the association was authorized to impose assessments for common area repair and maintenance, even absent a specific covenant in the owners' deeds permitting such dues. On appeal, the Superior Court affirmed, explaining:

> While it is true that in the instant case the deed does not explicitly spell out the exact obligation of the lot owners with regard to payment of dues for maintenance and repairs, the deed is not wholly silent as to the matter either. This is not a case where the property owners had no notice that an

21

association of owners would be formed or that the association might formulate rules applicable to the owners.

*Meadow Run*, 598 A.2d at 1026. The *Meadow Run* Court continued:

> This deed, while making no mention of an assessment, does put [the a]ppellants on notice that should an association of lot owners be formed in the future, they would be bound by any rules the association adopted concerning usage of development facilities. **Implied** in the existence of rules and regulations concerning usage of the facilities is the necessity for rules and regulations concerning maintenance of these facilities.

*Id.* (emphasis added). In conclusion, the *Meadow Run* Court held:

> [A]bsent an express agreement prohibiting assessments, when an association of property owners in a private development is referred to in the chain of title and has the authority to regulate each property owner's use of common facilities, **inherent in that authority is the ability to impose reasonable assessments on the property owners to fund the maintenance of those facilities**.

*Id.* at 1027 (emphasis added). Thus, even where a homeowners' association's power to impose assessments for common area use and maintenance is not mentioned in the chain of title, there is an implied agreement at law to pay for such use and maintenance. *See Spinnler Point Colony Ass'n v. Nash*, 689 A.2d 1026 (Pa. Cmwlth. 1997). In essence, the *Meadow Run* decision provided restitution to the homeowners' association for the maintenance and repair costs it incurred in providing services to the community.

Relying on *Meadow Run*, Appellants insist that Company's course of conduct in adhering to the 1996 Agreement between Company and Association created an implied contract between Company and Owners. However, unlike in *Meadow Run*, here, the General Declaration governs Owners' obligations to fund both Company and the Common Area's upkeep and, thus, the concept of a contract implied at law for restitution purposes, as in *Meadow Run*, is inapplicable to the

22

instant matter. Instead, Appellants request that this Court find a contract implied in fact based on course of conduct, and require Company to adhere to the perceived obligations of the 1996 Agreement.

With respect to a contract implied in fact, the **Company's and Association's** decision to enter into the 1996 Agreement does not support finding an implied contract between **Company and Owners** to bind Company's authority to impose fees.[19] Appellants quote internal Company communications acknowledging various responsibilities and restrictions under the 1996 Agreement with respect to changes to the Community dues and fees, and that amendments to the 1996 Agreement were necessary to avoid breaching the 1996 Agreement. However, any breach would be between Company and Association. Such acknowledgments do not support that an implied contract was created between Company and Owners based on Company's course of conduct in complying with the 1996 Agreement.

Additionally, the no-litigation clause, which the trial court found rendered the 1996 Agreement non-binding, reflects an obvious intent by the parties **not** to be bound to the conditions therein,[20] and undermines Appellants' contention

---

[19] Company's authority to impose fees and dues arises from the General Declaration. Appellants concede that the unrecorded 1996 Agreement is not an amendment to the General Declaration. *See* Appellants' Br. at 32, 52. Section 8.4(b) of the General Declaration, states:

> Any valid amendment shall become effective immediately upon proper recording in the office of the Recorder of Deeds for Monroe County of a document complying with the requirements of this [General Declaration] Section 8.4. Any other attempt to amend the provisions of this [General] Declaration shall be null and void and of no effect.

R.R. at 198a (capitalization omitted). Neither the 1996 Agreement nor the 2004 Agreement were recorded and neither address the General Declaration's covenants. Thus, in accordance with Section 8.4(b) of the General Declaration, they did not serve to amend the General Declaration's provisions and were "null and void and of no effect." General Declaration, Section 8.4(b).

[20] This Court has explained:

> 'The law of this Commonwealth makes clear that a contract is created where there is mutual assent to the terms of a contract by the parties

23

that an implied contract resulted from Company's conduct in adhering to the 1996 Agreement.[21]

The trial court observed:

> From a review of facts established, it does not appear there was a course of conduct between the parties that formed an implied contract. Before the 1996 Agreement, [] Company assessed fees and dues as it wished. The litigation which led to the 1996 Agreement was in the form of a declaratory judgment action to determine the rights and responsibilities of the parties. . . . [W]e do not find that the 1996 Agreement amended the General Declaration and find that the only 'clarification' it gives was an explanation of the cost centers [] Company uses to determine the amount of dues owed by each homeowner. We don't believe this to be a clarification or amendment to the General Declaration, but a clarification to [Owners] in order for them to better understand what their dues pay for as collected by [] Company. Furthermore, the language of the 1996 Agreement does not establish a hard line formula for calculating dues. On the contrary, the document states: '[c]onsideration must be given to potential future variations in costs. . . The

---

with the capacity to contract.' *Shovel Transfer & Storage, Inc. v. Pa. Liquor Control Bd.*, . . . 739 A.2d 133, 136 ([Pa.] 1999). In order for a contract to be formed, there must be an offer, acceptance, **and an exchange of consideration**. An enforceable agreement exists if the parties have **manifested their intent to be bound** by its terms and the terms are sufficiently definite.

*Beaver Dam Outdoors Club v. Hazleton City Auth.*, 944 A.2d 97, 103 n.2 (Pa. Cmwlth. 2008) (citation omitted; emphasis added).

[21] In the alternative, if the 1996 Agreement constituted a binding contract, upon its execution, Company was obligated to adhere to its terms. "**[P]erformance of that which one is already legally obligated to do is not consideration sufficient to support a valid agreement**." *Cohen v. Sabin*, 307 A.2d 845, 849 (Pa. 1973) (emphasis added); *see also Bricklayers of W. Pa. Combined Funds, Inc. v. Scott's Dev. Co.*, 90 A.3d 682 (Pa. 2014); *In re Commonwealth Trust Co. of Pittsburgh*, 54 A.2d 649 (Pa. 1947); *Pa. State Univ. v. Univ. Orthopedics, Ltd.*, 706 A.2d 863 (Pa. Super. 1998).

There is no evidence revealing the exchange of any additional consideration between Company and Owners in the creation of an alleged implied contract that purportedly contained the same obligations as the 1996 Agreement. Without added consideration, there could be no implied contract based on Company's course of conduct in adhering to the 1996 Agreement.

cumulative experience gained over the years will help fine tune each year's budget and best assure common understanding between the parties engaged in the budget and dues setting process.' [R.R. at 227a]. This 'cumulative experience' clearly began to take form when prior to 2004, [] Company started to add sports and recreational amenities, such as the pool, to the dues formula while also opening their use to all [O]wners.

Trial Ct. Op. at 15-16. In considering Appellants' argument, the trial court explained that the 2004 Agreement modified the 1996 Agreement by adding certain recreational facilities to the 'Community Services' cost center. The trial court reasoned:

This agreement was in place and followed for approximately a decade before the present litigation was filed. We are unable to establish [Appellants'] alleged course of conduct when the provisions of the 1996 Agreement were open to be changed and, indeed, were changed. Nor is the Court able to pinpoint any evidence to support [Appellants'] claims of a specific course of conduct. [Appellants'] argument appears to stem from desiring all the former practices, no matter when they occurred, and which were most favorable to them, be applied by the Court now. Clearly there was no specific 'course of conduct' between the years of 1996 through 2005 because the calculation of the dues formula continued to change and evolve as contemplated by the 1996 Agreement.

Trial Ct. Op. at 17. This Court discerns no error in the trial court's analysis.

Further, this Court has declined to find an implied contract where such would contradict a declaration's terms. *See Belleville v. David Cutler Grp.*, 118 A.3d 1184 (Pa. Cmwlth. 2015). In the instant matter, the General Declaration broadly authorizes Company to, *inter alia*, levy fees and dues "to promote [Owners'] recreation, health, safety and welfare," to promote **the Common Area's** "**improvement, operation and maintenance**," **and** to promote **Company's performance of its duties and the exercise of its powers**. R.R. at 184a (emphasis

added).  The General Declaration does not restrict this authority.[22]  Accordingly, this Court declines to recognize the creation of an implied contract that restricts Company's explicit power to do that which it is authorized to do under its General Declaration.[23]  For these reasons, the trial court properly concluded that no implied contract was created.

---

[22] To alter these powers, Company could amend the General Declaration.

[23] Appellants contend that the trial court erroneously held that the 1996 Agreement's no-litigation clause precluded Appellants from using the 1996 Agreement in the instant litigation because they are third-party beneficiaries bound by the 1996 Agreement's terms.  Without explanation, Appellants claim they "are not third party beneficiaries[.]"  Appellants' Br. at 56.  Instead, they claim to be "parties to an implied contract between [] Company and [Owners]."  *Id.*

> Under Pennsylvania law, . . . a person assumes third-party beneficiary status - and, as such, has standing to recover under a contract - only where both parties to the contract express an intention to benefit the third party and that intention appears in the contract.  Thus, the concept of a third-party beneficiary exists to give intended beneficiaries, under certain circumstances, standing to bring suit to obtain the benefits in question.

*Konyk*, 183 A.3d at 987-88 (citation omitted).  The Pennsylvania Supreme Court has further explained that "third[-]party beneficiaries are bound by the same limitations in the contract as the signatories of that contract.  The third[-]party beneficiary cannot recover except under the terms and conditions of the contract from which he makes a claim."  *Johnson v. Pa. Nat'l Ins. Cos.*, 594 A.2d 296, 298-99 (Pa. 1991).

Contrary to Appellants' assertion, both the 1996 Agreement and 2004 Agreement express an intent to benefit Owners, acknowledging Owners' "duty to pay their share of the costs[,]" R.R. at 220a, 259a, and provide a framework for assessing dues to be paid by Owners.  Importantly, the 2004 Agreement "[r]estate[d] and [a]mend[ed]" the 1996 Agreement but did not include the no-litigation clause.  R.R. at 259a.  Given that the 2004 Agreement removed the no-litigation clause, the trial court erroneously concluded that the no-litigation clause could effectively bar Appellants from presenting the 1996 Agreement at trial.  Notwithstanding, because Appellants do not seek recovery under either the 1996 Agreement or the 2004 Agreement, but instead, under an implied contract, and this Court has concluded that no implied contract exists, the trial court committed harmless error.  *See Knowles v. Levin*, 15 A.3d 504, 508 n.4 (Pa. Super. 2011) ("[H]armless error is defined as an error that does not affect the verdict.").

For all of the above reasons, the trial court's order is affirmed.[24]

_____
ANNE E. COVEY, Judge

---

[24] Appellants raise two additional issues before this Court. First, Appellants assert that the trial court erred in failing to find the current dues process inequitable, in that a publicly traded for-profit corporation has the power to indiscriminately tax Community members by increasing dues. However, as the trial court noted, "[Appellants] have failed to cite any case law which prevents a private corporation from operating within a private community as [] Company does." Trial Ct. Op. at 19. Similarly, in their brief to this Court, Appellants provide no legal authority for their argument, and thus it is waived. *See Browne.*

Appellants also contend that the trial court's decision bars future dues challenges based on dues calculations which include UPCA prohibited expenses. This Court cannot discern possible future causes of action that may accrue to Owners against Company, and it may not pre-emptively address the impact of the trial court's decision thereon.

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Michael J. Walters; Michael J.              :
Walters and Roseanne Walters,               :
husband and wife; Mark H. Attix;            :
Frederick John Bartek; Charles W.           :
Buttz and Teresa C. Buttz, husband          :
and wife; Joellen Chadwick; Mary            :
Ellen Christman; Brian Colfer and           :
Alicia Colfer, husband and wife;            :
David T. Councilor and Debra A.             :
Councilor f/k/a Debra Litchult,             :
husband and wife; David T.                  :
Councilor, Administrator of the             :
Estate of Theodore G. Councilor;            :
Mary Alchermes-Dilger, Joseph D.            :
Alchermes, and Christopher B.               :
Alchermes; Mark E. Elvin and                :
Shauna D. Elvin, husband and wife;          :
Susan E. Esterhay and Linda M.              :
Smith; Max H. Feldman and Kelee A.          :
Monahan-Feldman, husband and                :
wife; Leo J. Finnegan; Richard E.           :
John and Marilyn P. John, husband           :
and wife; Marilynn Ann Johnson;             :
Howard A. Kellner and Donna M.              :
Kellner, husband and wife; Douglas          :
D. Kelly; Russell R. Kice; John O.          :
Klinger and Brenda Klinger, husband         :
and wife; Mountain Home Enterprises         :
LLC; Erik Peterson and Gillian              :
Peterson, husband and wife; Clarke          :
Reid and Joanne Reid, husband and           :
wife; Patricia A. Russo; Edward M.          :
Satterthwaite; Jacob E. Seip and            :
Phyllis A. Seip, husband and wife;          :
Thomas D. Shore; Leslie D. Sopko;           :
Stags Leap Properties LLC; Elaine J.        :
Vula; William C. Wolfe,                     :
                    Appellants          :
                                  :
         v.                    :

Buck Hill Falls Company; :
Lot and Cottage Owners' : No. 52 C.D. 2019
Association of Buck Hill Falls :

# O R D E R

AND NOW, this 10th day of January, 2020, the Monroe County Common Pleas Court's September 4, 2018 order denying Lot and Cottage Owners' Association of Buck Hill Falls' summary judgment motion, granting Buck Hill Falls Company's summary judgment motion and dismissing the action is affirmed.

_____
ANNE E. COVEY, Judge